UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

SHERMON ALLEN,

      Plaintiff,

v.                                                          Case No.  2:23-cv-251-KCD-NPM

LARSON and M.
NEIDERHISER,

      Defendants.

_____/

## **ORDER**

Before the Court is the renewed motion for summary judgment filed by Defendants Kathleen Larson and Mitchell Neiderhiser. (Doc. 94.)[1] After careful consideration of the pleadings and record, the Court grants in part and denies in part Defendants' motion.

## I.      Background and Procedural History

Plaintiff, a prisoner of the Florida Department of Corrections, initiated this action in 2023 by filing a pro se civil rights complaint under 42 U.S.C. § 1983. He sued five corrections officers at Charlotte Correctional Institution. (Doc. 1.) After screening the complaint under 28 U.S.C. § 1915(e)(2)(B), the

---

[1] Plaintiff misspelled Defendant Neiderhiser's name in his amended complaint. (Doc. 11 at 4.)  The misspelling was repeated in the Court's earlier orders. However, the Court will use the correct spelling in this Order (including when quoting Plaintiff's pleadings or portions of earlier orders), and the Clerk will be directed to correct the misspelling on CM/ECF.

Court determined that Plaintiff had filed a shotgun pleading and ordered him to amend his complaint if he wished to proceed. (Doc. 8.) Plaintiff filed an amended complaint, the operative pleading before the Court. (Doc. 11.) Plaintiff raised several claims against the Institutional Classification Team (ICT) at Charlotte Correctional Institution because they placed him in cells with dangerous gang members even though they knew that he needed protection. He also raised First and Eighth Amendment claims against officers Larson and Neiderhiser.

The Court screened the amended complaint and summarized Plaintiff's First and Eighth Amendment claims as follows:

> Defendant Larson had Plaintiff placed in a cell with Blood Gang member Glenn Redding who refused to attack him. This upset Defendant Larson who told Plaintiff, "You don't sue my officers, this ain't NWFRC. You keep your mouth shut here girlfriend. I will be back." Thereafter, on February 20, 2023, Defendant Larson returned to his cell with Defendant Neiderhiser who was recording the event and holding two canisters of "chemical agents." Two other officers were watching. Defendant Larson told Defendant Neiderhiser to spray Plaintiff and Inmate Redding, allegedly because Inmate Redding did not strip from his boxer shorts fast enough. Plaintiff believes it was in retaliation for Inmate Redding not attacking him. After being sprayed, the prisoners were taken to the shower for decontamination. After the shower, Plaintiff was shackled, and when asked whether he had gotten the message, he replied "no ma'am." Defendant Larson then placed Plaintiff back into the shower and ordered Defendant Neiderhiser to spray him again, which he did. After he showered again, Plaintiff returned to his cell and discovered that Defendant Larson had ordered Plaintiff's cell stripped of its mattress, sheets, blankets, and

> uniform, including his t-shirts and socks. Plaintiff and Inmate Redding had to sleep on the steel bedframe in only boxer shorts for eight days in the winter.

(Doc. 21 at 1-4 (citations to the record omitted).) The Court dismissed Plaintiff's official capacity claims as barred by the Eleventh Amendment and determined that Plaintiff had not stated a claim against the ICT, comprised of Defendants Snider, Brock, and Scarpati. (Doc. 21 at 1–6.) However, it found that Plaintiff had stated plausible First and Eighth Amendment claims against Larson and Neiderhiser. (*Id.* at 8.)

After they appeared, Larson and Neiderhiser moved to dismiss, arguing that Plaintiff had filed another shotgun complaint and the facts alleged did not demonstrate that their use of pepper spray was sadistic or malicious. (Doc. 38 at 4-8.) The Court denied the motion, finding that Plaintiff's amended complaint "was not a model of clarity," but that Defendants could not "credibly argue that they [were] confused or unable to defend against [the] few remaining allegations." (*Id.* at 6, 7.)

Now before the Court is Larson and Neiderhiser's renewed motion for summary judgment. [2] Defendants argue that "the undisputed facts and evidence demonstrates that the Officers acted within their authority in an

---

[2] Defendants' original summary judgment motion (Doc. 75) cited to the video evidence only generally—a problem, given that each video runs for over an hour. The Court therefore directed Defendants to try again and file a renewed motion with pinpoint citations to the relevant footage (Doc. 90).

effort to maintain order in a correctional facility and obtain Plaintiff's compliance with direction. Accordingly, there is no question of material fact that the Officers are entitled to Summary Judgment as a matter of law." (Doc. 94 at 1.) In support, they provide three video clips from the prison (Doc. 75-3), a declaration from Larson (Doc. 95), and a declaration from Neiderhiser (Doc. 96).

Plaintiff responded to the motion for summary judgment and argues that Defendants are not entitled to judgment as a matter of law. (Doc. 86.) In support, he offers his own declaration (Doc. 86-1 at 1-4) and several portions of the Florida Administrative Code (Doc. 86-1 at 7-14).

## II.      Legal Standard

Summary judgment is not a substitute for trial. It is appropriate only "when a movant shows that there is no genuine dispute as to any material fact and [she] is entitled to judgment as a matter of law." *Gonzalez v. Indep. Ord. of Foresters*, No. 24-10758, 2025 WL 337898, at *2 (11th Cir. Jan. 30, 2025). "When deciding a motion for summary judgment, a judge is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Las Brisas Condo. Homes Condo. Ass'n, Inc. v. Empire Indem. Ins. Co.*, No. 2:21-CV-41-KCD, 2023 WL 8978168, at *1 (M.D. Fla. Dec. 28, 2023). "An issue is genuine if a reasonable jury could

return a verdict for the nonmoving party." *Do v. Geico Gen. Ins. Co.*, No. 1:17-CV-23041-JLK, 2019 WL 331295, at *2 (S.D. Fla. Jan. 25, 2019).

"The party seeking summary judgment bears the initial burden of demonstrating to the court, by reference to the record, that there are no genuine issues of material fact to be determined at trial." *Andrews v. Ciccone*, No. 3:23-CV-88-MMH-SJH, 2025 WL 2508878, at *2 (M.D. Fla. Sept. 2, 2025). "[A] fact is material if it may affect the outcome of the case under the applicable substantive law." *Toca v. Debonair Props. LLC*, No. 2:23-CV-303-KCD, 2025 WL 2106674 (M.D. Fla. July 28, 2025).

"When a moving party has discharged its burden, the non-moving party must then go beyond the pleadings," and by its own evidence, "designate specific facts showing that there is a genuine issue for trial." *Jeffery v. Sarasota White Sox, Inc.*, 64 F.3d 590, 593-94 (11th Cir. 1995). This requires the nonmovant to "identify specific evidence in the record" and "articulate the precise manner in which that evidence supports [its] claim." *Alexander as trustee of Franklin Pharmacy, LLC v. Aaron*, No. 3:15-CV-1314-AKK, 2017 WL 11437294, at *1 (N.D. Ala. June 1, 2017); *see also Diaz v. Kaplan Higher Educ., L.L.C.*, 820 F.3d 172, 177 (5th Cir. 2016). Summary judgment is required "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party

will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

## III.   Discussion

Though his operative complaint is not exactly a model of clarity, we can boil Plaintiff's grievances down to three discrete episodes. First, Plaintiff alleges that the officers subjected him to excessive force and retaliation when they deployed pepper spray against his cellmate, Glenn Redding (Episode One). Second, he brings identical claims based on the officers spraying him directly while he was secured in a decontamination shower (Episode Two). Finally, he claims Larson unlawfully retaliated against him by stripping his cell of linens and clothing, leaving him in a freezing cell for eight days (Episode Three). Each episode (and its attendant claims) will be addressed separately.[3]

In addressing these claims, instead of separately listing the parties' undisputed facts, the Court sets out and considers the relevant material facts (disputed and undisputed) as needed. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) ("Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of

---

[3] To the extent Plaintiff intended to raise claims not addressed in this Order, they are dismissed under 28 U.S.C. § 1915(e)(2)(B) for failure to state a claim on which relief may be granted.

summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted.").

### A. Episode One – the officers' use of pepper spray against Glenn Redding

Plaintiff asserts that several officers approached the cell he shared with inmate Glenn Redding after an earlier prison disturbance in which neither he nor Redding were involved. (Doc. 86 at 2-3.) Larson ordered the inmates to strip for a search, and Plaintiff complied. (*Id.* at 3.) Redding, however, argued with the officers, accusing them of "messing" with him. (*Id.*) Plaintiff asserts that Redding eventually complied, but the officers sprayed him (Redding) anyway, causing residual pepper spray to land on Plaintiff's buttocks, back, and head even though he was not the intended target. (*Id.*) Plaintiff seeks relief under the First and Eighth Amendments.

It is undisputed that Larson ordered Neiderhiser to spray Redding to gain compliance with her order to strip. (Doc. 86 at 3, ¶ 6-7; Doc. 94 at 2, ¶ 4; Doc. 96 at 2, ¶¶ 6-7; Doc. 95 at 1, ¶ 2.)[4] Thus, the initial use of force (the pepper spray) was directed at Redding, not Plaintiff. Plaintiff cannot establish retaliation or excessive force claims—intentional torts that require a culpable mental state—based on an outcome that was not intended. *See Allen v. Bedard*,

---

[4] Despite Plaintiff's assertion that the use of force against Redding was captured on bodycam video, neither party offered footage showing the first use of force, and neither of the fixed-wing videos shows Episode One.

No. 2:13-cv-787-Ftm-29DNF, 2103 WL 6231233, at *5 (M.D. Fla. Dec. 2, 2013) ("[A]n essential element of a First Amendment retaliation claim is the existence of a retaliatory motive."); *Campbell v. Sikes*, 169 F.3d 1353, 1362 (11th Cir. 1999) (recognizing that "[c]rucial to establishing an [Eighth Amendment excessive force claim] is some proof that officials acted with specific intent").

Moreover, Plaintiff admits that Redding argued with the officers regarding the need to strip. Even if Redding believed Larson's order was unfair, he was not excused from complying with it. *See Pearson v. Taylor*, 665 F. App'x 858, 864 (11th Cir. 2016) ("Officers are not required to convince every prisoner that their orders are reasonable and well-thought out before resorting to force."). "As a general matter, prison officials are authorized to use force when a prisoner fails to obey an order[,]" and pepper spray "is an accepted non-lethal means of controlling unruly inmates." *Jacoby v. Mack*, 755 F. App'x 888, 898 (11th Cir. 2018); *see also Muhammad v. Sapp*, 494 F. App'x 953, 957-58 (11th Cir. 2012) (use of chemical agents on inmate who refused to shave did not qualify as excessive force).

The evidence does not show that either Defendant intended to use pepper spray against Plaintiff when they sprayed Redding for refusing to comply with Larson's order to strip. Thus, Plaintiff cannot show the requisite intent for a

constitutional violation. And in any event, the undisputed evidence provides that the use of force was reasonable.

### B. Episode Two – Neiderhiser's use of pepper spray against Plaintiff

After the first pepper spray (against Redding), Plaintiff was escorted to a decontamination shower where he was sprayed a second time (Episode Two). (Doc. 94 at 2, ¶ 6; Doc. 86 at 3, ¶ 8-9.) All of Episode Two is captured by an unidentified officer's body camera (Video Two), and both Plaintiff and the defendants point to the video to support their arguments. Thus, the authenticity of Video Two is not disputed, and the Court considers it to be an accurate depiction of the events that transpired. *See Scott v. Harris*, 550 U.S. 372, 380-81 (2007) (a court may properly consider video evidence in ruling on a motion for summary judgment and should view the facts "in the light depicted by the videotape"). However, the Court draws all inferences in Plaintiff's favor. *See Pourmoghani-Esfahani v. Gee*, 625 F.3d 1313, 1315 (11th Cir. 2010). Thus, if the "recording renders a party's story merely unlikely yet does not necessarily contradict it, the default rule kicks in: [the Court] must accept the party's version for purposes of considering the motion for summary judgment." *Brooks v. Miller*, 78 F.4th 1267, 1278 (11th Cir. 2023).

Plaintiff raises both Eighth Amendment excessive force and First Amendment retaliation claims based on activity that occurred during Episode Two, and the Court addresses those distinct claims separately.

### 1. Eighth Amendment Excessive Force (Larson and Neiderhiser)

The first eleven minutes of Video Two show Plaintiff's escort from his cell to the decontamination area where Plaintiff took his first shower. During the escort and shower, Plaintiff complained that he was sprayed in his cell for no reason. (Video Two at 10:49.) He called Larson to his shower, and she asked him if he felt relief yet. He answered, "Hell, no!" (*Id.* at 11:04.) Larson told Plaintiff to wash his face. He complained that his testicles burned and expressed anger that he was sprayed in the first place. Larson told Plaintiff to stop "yelling out." (*Id.* at 11:27.) He asked what she said, and she repeated, "You need to stop yelling out." (*Id.* at 11:31). Plaintiff continued muttering and complaining about the decontamination shower's hot water for about four minutes. (*Id.* at 11:44-15:43.) Larson then approached the cell, told Plaintiff to pat dry, and ordered Officer Medina to open the shower door. (*Id.* at 15:53.)

While toweling off, Plaintiff made comments that are unintelligible to the Court, but which appear to be questions directed to Larson. (*Id.* at 16:40.) Larson directed him to "handle this first. Questions will be answered after." (*Id.* at 16:43.) Plaintiff complained that he was "framed and that ya'll didn't

say hands up or nothing." (*Id.* at 16:56.) Larson answered that "when you're given your final order, that's your hands up." (*Id.* at 17:00.) Plaintiff continued to complain, and Larson told him to "just dry off." (*Id.* at 17:05.) When Plaintiff said that he didn't "say shit all day," Larson told him, "You're doing it still." (*Id.* at 17:30.) Plaintiff asked, "doing what?" Larson answered, "Not following my orders." (*Id.* at 17:14.) While still standing in the shower, Plaintiff was provided clean boxer shorts. He complained that the shorts were too small and was told numerous times by the officers to put them on anyway. (*Id.* at 17:48.)

After Plaintiff put on the boxers (which appeared to fit), he was cuffed and backed out of the shower, where he knelt on the ground, presumably for the application of leg restraints. (*Id.* at 19:48.) Larson ordered Plaintiff to "stay quiet," to which he appeared to ask, "You framing me again?" (*Id.* at 19:58.) He continued to complain and berate the officers about the prior spraying, although his words are not intelligible. Larson then directed the officers to "put him back in the shower." (*Id.* at 20:17.) Larson stated, "at this time, Inmate Allen continues to be disruptive." (*Id.* at 20:25.) Plaintiff retorted, "I wasn't disruptive in the first place." (*Id.* at 20:30.) Neiderhiser immediately applied three bursts of pepper spray and left the area. (*Id.* at 20:43.) Plaintiff remained standing in the shower area (handcuffed with no running water). After about five minutes, he began to yell but was told to "cease [his] disorderly actions." (*Id.* at 26:16.) Ten minutes after being sprayed the second time, Larson

approached Plaintiff's cell and asked whether he planned to comply with all orders given. (*Id.* at 30:40.) Plaintiff continued to whine that he was not doing anything. (*Id.* at 30:51.) Plaintiff was cuffed and removed from the shower about twelve minutes after the second application of pepper spray. (*Id.* at 31:56.) Fourteen minutes after being sprayed the second time, he was placed in a different decontamination shower. (*Id.* at 33:04.)

In Eighth Amendment excessive force claims, the "core judicial inquiry" is "not whether a certain quantum of injury was sustained, but rather whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." *Wilkins v. Gaddy*, 559 U.S. 34, 37 (2010). In determining whether force meets this standard, a court considers: (1) the need for the application of force; (2) the relationship between the need and the amount of force used; (3) the extent of the injury inflicted upon the prisoner; (4) the extent of the threat to the safety of staff and inmates, as reasonably perceived by the responsible officials based on facts known to them; and (5) any efforts made to temper the severity of a forceful response. *Whitley v. Albers*, 475 U.S. 312, 321 (1986). Any action taken should be viewed in light of the wide-ranging deference accorded to prison officials who are acting to preserve discipline and institutional security. *Hudson v. McMillian*, 503 U.S. 1, 6 (1992).

Applying the *Whitley* factors to the evidence here—namely the undisputed facts and what is seen in Video Two and construed in the light most favorable to Plaintiff—the Court concludes that a reasonable jury could find that Larson and Neiderhiser used excessive force during the second application of pepper spray. While Plaintiff verbally complained to the officers about the use of pepper spray on Redding, he was physically restrained at all times, complied with all orders to turn or submit to hand or leg restraints while offering no physical resistance, and made no verbal or physical threats against any officer or other inmate. Thus, the first and fourth *Whitley* factors favor Plaintiff. And when Plaintiff whined about his treatment—namely the first use of pepper spray—Larson ordered Plaintiff back into the shower for a second application of pepper spray less than twenty seconds after he was removed from the shower and kneeling on the ground—again, not posing a physical threat to anyone.

After he was sprayed the second time, Plaintiff was left cuffed in the dry shower with large amounts of pepper spray seen dripping from his skin and saturating his briefs for fourteen minutes before receiving another decontamination shower. Defendants offer no explanation for the delay in removing the second application of pepper spray. This delay is particularly inexplicable here because Plaintiff was standing in a working decontamination shower the entire time, yet no actions were taken to mitigate the presence of

pepper spray on Plaintiff's skin and shorts—even after he yelled for help. The second and fifth *Whitley* factors favor Plaintiff.

And while Plaintiff does not allege that he suffered significant physical injury from the spray (the third *Whitley* factor), "[w]hen prison officials maliciously and sadistically use force to cause harm, contemporary standards of decency always are violated . . . whether or not significant injury is evident. Otherwise, the Eighth Amendment would permit any physical punishment, no matter how diabolic or inhuman, inflicting less than some arbitrary quantity of injury." *Hudson*, 503 U.S. at 9.

The balance of the *Whitley* factors favor Plaintiff on his Eighth Amendment claims against Larson and Neiderhiser. Thus, the Court finds fact issues remaining as to whether the second application of pepper spray was applied maliciously and sadistically to cause harm. Larson and Neiderhiser are denied summary judgment on Plaintiff's excessive force claim based on Episode Two.

### 2.   First Amendment Retaliation (Larson)

The Court also finds that Larson is not entitled to summary judgment on Plaintiff's First Amendment retaliation claim. Under the First Amendment, a prison official may not retaliate against a prisoner for exercising his right to free speech. *Farrow v. West*, 320 F.3d 1235, 1248 (11th Cir. 2003). And "[a] prisoner can establish retaliation by demonstrating that the prison official's

actions were the result of his having filed a grievance concerning the conditions of his imprisonment." *Id.* "To prevail on a retaliation claim, the inmate must establish that: (1) his speech was constitutionally protected; (2) the inmate suffered adverse action such that the official's allegedly retaliatory conduct would likely deter a person of ordinary firmness from engaging in such speech; and (3) there is a causal relationship between the retaliatory action . . . and the protected speech." *O'Bryant v. Finch*, 637 F.3d 1207, 1212 (11th Cir. 2011).

It is undisputed that Plaintiff's lawsuits against corrections officers in the Northern District of Florida were protected speech. *Hollins v. Samuals*, 540 F. App'x 937, 938-39 (11th Cir. 2013) ("We've routinely held that a prisoner's complaints about prison conditions, via administrative grievances, lawsuits, and the like are protected under the First Amendment."). Plaintiff alleges that after an unrelated disturbance in Plaintiff's dormitory—caused by other inmates—Larson approached his cell and told him that she was aware of his frequent litigation against her friends at the Northwest Florida Reception Center and that such behavior would not be tolerated at Charlotte. (Doc. 86 at 2, ¶ 3.) Larson denies that she spoke with Plaintiff "beyond giving him instruction in an effort to secure compliance." (Doc. 95 at 2, ¶ 14.) Thus, whether Larson threatened Plaintiff is a disputed fact.

Even accepting that Larson threatened Plaintiff, as the Court must, "[i]t is not enough to show that an official acted with a retaliatory motive and that

15

the plaintiff was injured—the motive must *cause* the injury. Specifically, it must be a 'but-for' cause, meaning that the adverse action against the plaintiff would not have been taken absent the retaliatory motive." *Nieves v. Bartlett*, 587 U.S. 391, 398 (2019). Nevertheless, a reasonable jury could find, based on the record before the Court, that the second use of pepper spray and the delay in decontamination were motivated by Larson's desire to retaliate against Plaintiff for his prior lawsuits.

One last issue. Defendants both seek qualified immunity based on the premise that they did not violate any clearly established law. (Doc. 94 at 4.) But that defense is a non-starter on this record. To be sure, qualified immunity gives government officials breathing room to make reasonable mistakes, protecting all but the plainly incompetent or those who knowingly violate the law. *See, e.g.*, *Keating v. City of Miami*, 598 F.3d 753, 762 (11th Cir. 2010). By the time of these events in 2023, however, the legal lines here were not blurry. Eleventh Circuit precedent had long established that an officer cannot maliciously deploy force—like pepper spray—against a fully restrained, compliant inmate who poses absolutely no physical threat. *See, e.g.*, *Danley v. Allen*, 540 F.3d 1298, 1310 (11th Cir. 2008). Indeed, "[t]here is no room for qualified immunity in Eighth and Fourteenth Amendment excessive force cases because they require a subjective element that is so extreme that no reasonable person could believe that his actions were lawful." *Id.* Nor can an

16

officer use force to retaliate against an inmate for exercising his First Amendment right to file grievances. *See, e.g., Smith v. Mosley*, 532 F.3d 1270, 1276 (11th Cir. 2008). Every reasonable official would have understood that the Constitution forbids doing what the video and Plaintiff's evidence suggest happened here. Because a jury could reasonably find that Defendants crossed those clearly established lines, the shield of qualified immunity must give way.

### C. Episode Three – Larson's deprivation of linens and clothing

Finally, Plaintiff claims that after the two incidents of pepper spray, he was taken back to his cell wearing only boxer shorts. (Doc. 86 at 4, ¶ 15.) He alleges that he and Redding were denied linen, clothing, and any protection "from the freezing February winter weather" for eight days in an unheated cell. (*Id.* ¶¶ 15-16.) Other than asserting that Plaintiff was given clean linen after his second decontamination shower (Doc. 94 at 3, ¶ 8), Defendants do not address this claim.

Once again, there is a question of fact as to whether Larson threatened Plaintiff about his prior lawsuits and whether he was left in a cold cell without clothing or linens in retaliation for filing those lawsuits. Construing the allegations in Plaintiff's favor, the Court finds that the alleged retaliatory conduct would likely deter a person of ordinary firmness from engaging in protected speech. Larson is thus not entitled to summary judgment on the First Amendment claim surrounding Episode Three. Nor can she seek refuge in

qualified immunity. It is beyond serious debate that a prison official cannot weaponize the basic conditions of confinement—such as stripping an inmate of clothing and bedding in the dead of winter—as a penalty for exercising First Amendment rights. *See, e.g.*, *Thomas v. Evans*, 880 F.2d 1235, 1242 (11th Cir. 1989) ("The gist of a retaliation claim is that a prisoner is penalized for exercising the right of free speech. The penalty need not rise to the level of a separate constitutional violation.").

## IV.   Conclusion

For these reasons, it is **ORDERED**:

1. Defendants' renewed motion for summary judgment (Doc. 94) is **GRANTED in part** and **DENIED in part.**

   a. Summary judgment is **GRANTED** as to the Eighth Amendment claims against Defendants Larson and Neiderhiser surrounding the events that occurred in Episode One (the first use of pepper spray).

   b. Summary judgment is **GRANTED** as to the First Amendment claim against Defendant Larson surrounding the events that occurred in Episode One.

   c. Summary judgment is **DENIED** as to the Eighth Amendment claims against Defendants Larson and Neiderhiser

18

surrounding the events that occurred in Episode Two (the second use of pepper spray).

d. Summary judgment is **DENIED** as to the First Amendment claim against Defendant Larson surrounding the events that occurred in Episode Two.

e. Summary judgment is **DENIED** as to the First Amendment claim against Defendant Larson surrounding the events that occurred in Episode Three (the deprivation of linens and clothing).

2. Plaintiff shall file with the Court and serve upon Defendants a pretrial narrative statement within **FORTY-FIVE (45) DAYS** from the date of this Order. The Pretrial Narrative Statement shall contain:

a. A brief general statement of the case;

b. A narrative written statement of the facts that will be offered by oral or documentary evidence at trial;

c. A list of all exhibits to be offered into evidence at the trial of the case;

d. A list of the full names and addresses and places of employment for all the non-inmate witnesses Plaintiff intends to call;

e. A list of the full names of all inmate witnesses Plaintiff intends to call;

f. A summary of the anticipated testimony of each witness named in (d) and (e);

g. A stipulation of facts/issues to be tried; and

h. An estimated length of trial.

3. Within **FIFTEEN (15) DAYS** from the date Plaintiff files his pretrial narrative statement, the defense shall file and serve upon Plaintiff a pretrial narrative statement that complies with paragraph two.

4. The Court encourages the parties to strongly consider settlement discussions, although they are not required to do so.[5]

5. The **Clerk** is **DIRECTED** to correct the spelling of Defendant Mitchell Neiderhiser's name in CM/ECF.

**ENTERED** in Fort Myers, Florida on March 31, 2026.

Kyle C. Dudek
United States District Judge

---

[5] If the parties engage in settlement discussions, the Court requests that a joint notice be filed to notify the Court. Upon filing of any notice of settlement discussions, the Court would also entertain a motion to stay the deadlines in this case.